**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| KEVIN BORDEN, | ) | CIV-F-08-1061 AWI SMS |
| Plaintiff, | ) | |
| | ) | ORDER RE: MOTION FOR |
| v. | ) | PRELIMINARY INJUNCTION |
| | ) | |
| CITY OF MODESTO, ET AL, | ) | |
| | ) | |
| Defendants. | ) | |

**I. History**[1]

Plaintiff Kevin Borden is suing the City of Modesto and two city employees, alleging they deprived him of a number of rights protected by the U.S. Constitution by frustrating his attempts at proselytizing in a public place.  The Tenth Street Plaza ("Plaza") is a public pedestrian mall located in Modesto.  Physically, the Plaza is a typical street with a roadway in the middle and two sidewalks.  Tenth Street is closed to vehicular traffic between J Street to the south and K Street to the north with two lines of waist-high, cylindrical bollards running across the roadway, capping each end.  A number of bollards are also on the edge of the sidewalks on both sides.  The bollards form a rough perimeter around the roadway.  The Plaza is lined with

---

[1]The factual history is provided for background only and does not form the basis of the court's decision; the assertions contained therein are not necessarily taken as adjudged to be true. The legally relevant facts relied upon by the court are discussed within the analysis.

1   government buildings and businesses including Brenden Theatres ("Brenden"), a movie theater.

2   Brenden is located in the middle of the block, on the west side of the Plaza.  On the east side of

3   the Plaza, closer to J Street than K Street, there is a break in the buildings allowing for a wide

4   open space with tables and a fountain, which leads off to a parking garage.  J Street, K Street, and

5   the parking garage are the three pedestrian access points to the Plaza.

6        Modesto has an official usage policy for the Plaza, adopted in 2002.  The policy requires

7   permits for use of loudspeakers and allows for the rental of the entire Plaza for events.  The

8   policy explicitly exempts activities covered by the First Amendment.  Over the past three years,

9   Borden and associated individuals have been gathering in the Plaza on Saturday nights to

10  proselytize an unspecified Christian sect.  They wear shirts and hold signs with religious

11  messages, preach, and have one-on-one religious discussions with passersby.  Initially, Borden

12  used a sound amplification system, receiving permits from the Modesto Police Department.  The

13  businesses lining the Plaza, including Brenden, complained about Borden and his associates.  On

14  March 7, 2007, the Modesto Police Department refused to issue any more sound amplification

15  permits to them.  On March 21, 2007, Borden and his associates were preaching in the Plaza

16  when Modesto police officers approached and told them to leave, threatening arrest.  Roy

17  Wasden, Chief of the Modesto Police Department, happened to pass by while off duty and

18  clarified that Borden and his associates could continue their activities as long as they were not

19  blocking access to the businesses.

20       Starting in September 2007, Brenden began renting the Plaza from Modesto on various

21  Friday and Saturday nights.  The parties dispute whether Brenden held any special events in the

22  Plaza when they rented it.  On those nights, Brenden set up metal barricades (which resemble

23  bicycle racks) to mark out a portion of the Plaza.  The size of the barricaded area is disputed by

24  the parties.  On an unspecified number of occasions when Borden and associates gathered within

25  those bounds, Brenden employees and Plaza security have asked them to stay outside of the

26  barricaded area, threatening arrest if they did not comply.  Borden claims that Brenden has not

27  asked anyone else to leave the area.  Brenden does not exclude Borden from the parts of the

28  Plaza that are outside of its barricades.

2

Borden contacted a number of Modesto employees to clarify whether or not Brenden had the authority to exclude him when it rented out the Plaza. Defendant Susana Wood (city attorney for Modesto) and Defendant Vicki Rice (assistant manager of the Plaza) are two such employees. The parties disagree as to what representations the various employees contacted made to Borden. Defendants assert that since June 2008, the only time Brenden has rented out the Plaza was for a blood drive in August.

Borden filed suit against the Modesto, Rice, and Wood, alleging violations of freedom of speech, free exercise of religion, due process, equal protection, as well as conspiracy to violate civil rights. Doc. 1. Borden now moves for a preliminary injunction. A hearing was held on October 27, 2008. No order was issued and the hearing was continued to November 17, 2008 to allow the parties a chance to work on the language of any proposed injunction.

## II. Legal Standards

A preliminary injunction may issue if a moving party establishes: (1) a likelihood of success on the merits and the possibility of immediate irreparable injury, or (2) the existence of serious questions going to the merits and that the balance of hardships tips heavily in its favor. See Metro Publishing, Ltd. v. San Jose Mercury News, 987 F.2d 637, 639 (9th Cir. 1993). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." Oakland Tribune, Inc. v. Chronicle Pub. Co., 762 F.2d 1374, 1376 (9th Cir. 1985). Alternatively, the traditional test requires a plaintiff to establish "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiffs if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiffs, and (4) advancement of the public interest (in certain cases)." Southwest Voter Registration Education Project v. Shelley, 344 F.3d 914, 918-19 (9th Cir. 2003), quoting Johnson v. Cal. State Bd. of Accountancy, 72 F.3d 1427, 1430 (9th Cir. 1995). To receive temporary injunctive relief under any articulation of the relevant test, the moving party must show a "significant threat of irreparable injury, irrespective of the magnitude of the injury." Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1397 n.1 (9th

1   Cir. 1997), quoting <u>Big Country Foods, Inc. v. Board of Educ.</u>, 868 F.2d 1085, 1088 (9th Cir.

2   1989).

3       "The urgency of obtaining a preliminary injunction necessitates a prompt determination

4   and makes it difficult to obtain affidavits from persons who would be competent to testify at trial.

5   The trial court may give even inadmissible evidence some weight, when to do so serves the

6   purpose of preventing irreparable harm before trial." <u>Flynt Distributing Co. v. Harvey</u>, 734 F.2d

7   1389, 1394 (9th Cir. 1984), citing 11 C. Wright and A. Miller, Federal Practice and Procedure,

8   §2949 at 471 (1973).  The court "has discretion to weight the evidence as required to reflect its

9   reliability." <u>Dr. Seuss Enterprises, L.P. v. Penguin Book USA, Inc.</u>, 924 F. Supp. 1559, 1562

10  (S.D. Cal. 1996), citations omitted.

11

12                                **III. Discussion**

13  **A. Scope of the Motion**

14      Borden's original briefing for the preliminary injunction motion is genuinely ambiguous

15  as to the scope of the injunction sought.  Borden characterizes his motion as follows:

16      This case arises from the efforts by the City of Modesto, including its employees and
        agents, to exclude a group of Christians from a traditional public forum because of the
17      content and viewpoint of their speech. To accomplish this, the City has been conspiring
        with employees of Brenden Theatres, Inc., allowing the theater to rent Tenth Street Plaza,
18      a public plaza where Brenden and other businesses are located, virtually every Saturday
        evening since the fall of 2007. Not coincidentally, Plaintiff Kevin Borden has been using
19      the Plaza to engage in religious expression nearly every Saturday evening for the past
        three years. But the City has given Brenden express permission to have Mr. Borden
20      arrested if he is found within that area, even though it is still open to the public, Brenden
        does not exclude anyone else, and has no event taking place. Mr. Borden believes the City
21      has also instructed its Police Department to arrest him and his companions if they engage
        in expressive activity in the Plaza when Brenden has rented it. These actions are clearly
22      unconstitutional under settled precedent in this jurisdiction and are blatant violations of
        Mr. Borden's First and Fourteenth Amendment rights.
23

24  Doc. 17, Brief, at 7:2:14.  In substance, Borden's briefing is focused on his First Amendment free

25  speech rights, specifically, free speech in a traditional public forum when that space is rented out

26  by a private entity.  Defendants' opposition interpreted the motion narrowly, noting the lack of

27  clarity in Borden's motion. See Doc. 23, Opposition, at 2:3-8 and 15:15-26.  Borden's reply does

28  not challenge Defendants' narrow framing of the motion.  Thus, the court accepts that the bounds

                                        **4**

1   of this motion is tightly limited.  The court interprets this motion for preliminary injunction

2   narrowly as one seeking to prohibit Modesto from cooperating with Brenden's attempts to

3   exclude him from any part of the Plaza when it is rented out.  This motion does not cover acts by

4   Brenden or acts when the Plaza is not rented out by Modesto.

5

6   **B. Free Speech**

7         The U.S. Supreme Court set out a basic framework for analyzing free speech issues: (1) is

8   the speech protected; (2) what is the nature of the forum; and (3) do the justifications for

9   exclusion satisfy the standard applicable to the forum. <u>Cornelius v. NAACP Legal Def. & Educ.</u>

10  <u>Fund</u>, 473 U.S. 788, 797 (1985).  An additional question is whether the suppression of the speech

11  constitutes state action.

12        There is no question that Borden's religious proselytizing is a protected activity. <u>Heffron</u>

13  <u>v. Int'l Soc. for Krishna Consciousness</u>, 452 U.S. 640, 647 (1981).  "Government regulation of

14  speech in public spaces has historically been governed by the public forum doctrine. The extent

15  to which the government can control access depends on the nature of the relevant forum.

16  <u>Pocatello Educ. Ass'n v. Heideman</u>, 504 F.3d 1053, 1060 (9th Cir. 2007), citations omitted.

17       In places which by long tradition or by government fiat have been devoted to assembly
    and debate, the rights of the State to limit expressive activity are sharply circumscribed.

18  At one end of the spectrum are streets and parks which have immemorially been held in
    trust for the use of the public and, time out of mind, have been used for purposes of

19  assembly, communicating thoughts between citizens, and discussing public questions. In
    these quintessential public forums, the government may not prohibit all communicative

20  activity. For the State to enforce a content-based exclusion it must show that its
    regulation is necessary to serve a compelling state interest and that it is narrowly drawn to

21  achieve that end. The State may also enforce regulations of the time, place, and manner of
    expression which are content-neutral, are narrowly tailored to serve a significant

22  government interest, and leave open ample alternative channels of communication.\

23  <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 45 (1983), citations omitted.

24  "[E]ven in a public forum the government may impose reasonable restrictions on the time, place,

25  or manner of protected speech, provided the restrictions 'are justified without reference to the

26  content of the regulated speech, that they are narrowly tailored to serve a significant

27  governmental interest, and that they leave open ample alternative channels for communication of

28  the information.'" <u>Ward v. Rock against Racism</u>, 491 U.S. 781, 791 (1989), quoting <u>Clark v.</u>

1  Community for Creative Non-Violence, 468 U.S. 288, 293 (1984).  The Plaza is clearly a

2  traditional public forum, as acknowledged by both sides.

3      The two key issues the parties disagree on are the status of the Plaza when it is rented and

4  whether the alleged actions taken to suppress Borden's speech constitute state action.

5

6  **1. Status of the Plaza When Rented**

7  **a. Facts of Brenden's Rental**

8      First, the parties clarify that the area from which Borden and his associates were

9  proscribed was the barricaded area and not the whole Plaza.  Rice states, "I told Plaintiff that

10  Brenden could exclude him from the cordoned-off area when they were conducting private

11  events." Doc. 23, Part 5, Rice Declaration, at 3:2-3.  Borden states "Brenden security also told

12  me that the barricades were there to indicate where I was allowed to engage in speech." Doc. 26,

13  Borden Declaration, at 2:24-25.

14      The precise bounds of the barricaded area are disputed.  Physically, the barricades were

15  set up on the roadbed (one set in the north and one set in the south), but did not extend over the

16  sidewalks.  There were no barricades blocking off the open space containing tables and fountain.

17  Saul Trujillo, Brenden's general manager, states, "the area that we exercised control over was

18  much smaller than the entire Plaza, and essentially amounted to the area around the front of the

19  theater. Typically, lightweight metal 'bicycle barricades' were placed across the street area at the

20  Jamba Juice business on the 'K' Street side, and at the Senor Fresh restaurant on the 'J' Street

21  side. Brenden did not exercise control outside of the barricades, and did not exercise control over

22  the concrete patio area across the street from the theater." Doc. 36, Part 3, Trujillo Declaration, at

23  2:19-24.  Borden claims, "The barricades gradually expanded outward each time Brenden rented

24  the Plaza, but most commonly were placed north of Starbucks, close to K Street, and south of

25  Señor Fresh Mexican Restaurant, close to J Street....There are other businesses located within the

26  barricaded area—notably Starbucks, Fuzio, Jamba Juice, Legends Ice Cream, and Señor Fresh

27  Mexican Restaurant." Doc. 26, Borden Declaration, at 2:18-20 and 3:8-9.  One of Borden's video

28  exhibits shows Brenden security guards ejecting his associates from the sidewalk in front of

**6**

1   Brenden and Señor Fresh, telling them they had to get on the other side of the barricades.  Thus,

2   the barricades must be interpreted to notionally extend in a straight line over the sidewalks,

3   encompassing the whole street from storefront to storefront.  The barricaded area included the

4   entrance to other businesses fronting the Plaza. See Doc. 23, Part 5, Map.

5           Stacey Bean, Modesto's Events Coordinator for the Plaza, states, "With Brenden's rental

6   of the Plaza, it was a requirement to leave clear access to pedestrians exiting or entering Plaza

7   from 'J' and 'K' Streets, as well as the parking structure near the fountain area. It was also a

8   requirement not to obstruct the businesses in the Plaza." Doc. 23, Part 3, Bean Declaration at

9   2:24-26.  Thus, to cross from the K Street entrance of the Plaza to the J Street entrance, a

10  pedestrian had to cross through the barricaded area and Brenden was required to allow the

11  pedestrian to pass through.  Brenden also had to allow pedestrians to access other businesses

12  whose storefronts were behind the barricades.  Defendants initially argued that "Plaintiff has

13  failed to demonstrate that Brenden's events were 'open to the public,' such that any person could

14  go inside of the cordoned-off area for purposes unrelated to Brenden's business enterprise. If a

15  person could not enter Brenden's theater building for a purpose unrelated to Brenden's business

16  enterprise, then the same would apply to the outdoor area that was rented from defendant CITY."

17  Doc. 23, Opposition, at 12:21-25.  Defendants then amended their position to say that "Persons

18  who were loitering, panhandling, or who were otherwise not in the cordoned-off area for a

19  *purpose related to Brenden's business, or the businesses adjacent to the theater*, were typically

20  removed from the area by Brenden's security personnel." Doc. 36, Sur-Reply, at 4:10-13,

21  emphasis added.  Borden states, "Pedestrians are permitted to flow through the area between the

22  barricades, and people gather in the area between the barricades." Doc. 26, Borden Declaration,

23  at 2:26-27.  The evidence plainly suggests that pedestrians had ready access to the full Plaza,

24  including the barricaded areas.

25          Defendants assert that, "The main purpose for Brenden's rental of the Plaza area for these

26  events was to promote Brenden's e-mail club, and to encourage persons to sign up for our e-mail

27  club. There were also occasions when costumed movie characters would be utilized to promote

28  movies being shown at the theater." Doc. 36, Part 3, Trujillo Declaration, at 2:7-10.  Borden

**7**

claims that, "Brenden has not been conducting any events in the Plaza necessitating its rental." Doc. 1, Complaint, at 8:6.  But, Borden's associate, Joaquin Benitez, does state, "I do remember approximately two occasions when Brenden put the barricades up in the usual spot and also set up a table near the entrance to their theatre to do some kind of promotion....I have never seen any movie characters in front of Brenden or any other similar activity while the barricades were up." Doc. 27, Benitez Declaration, at 2:21-25.  The court accepts that Brenden had some sort of event going on when it rented out the Plaza, but that the event in no way encompassed the whole of the barricaded area.

**b. Traditional Public Forum Status**

Borden states, "a traditional public forum does not lose its character as such through use by private entities."[2] Doc. 17, Brief, at 13:9-10.  Despite that categorical statement, in his

----

[2]Unaddressed is the closely related issue of free speech on the grounds of a privately owned and operated pedestrian mall.  The U.S. Supreme Court said:

The basic issue in this case is whether respondents, in the exercise of asserted First Amendment rights, may distribute handbills on Lloyd's private property contrary to its wishes and contrary to a policy enforced against all handbilling. In addressing this issue, it must be remembered that the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on state action, not on action by the owner of private property used nondiscriminatorily for private purposes only....

Respondents contend, however, that the property of a large shopping center [of approximately 50 acres which] is 'open to the public,' serves the same purposes as a 'business district' of a municipality, and therefore has been dedicated to certain types of public use. The argument is that such a center has sidewalks, streets, and parking areas which are functionally similar to facilities customarily provided by municipalities. It is then asserted that all members of the public, whether invited as customers or not, have the same right of free speech as they would have on the similar public facilities in the streets of a city or town.

The argument reaches too far. The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use. The closest decision in theory, Marsh v. Alabama, [326 U.S. 501 (1946)], involved the assumption by a private enterprise of all of the attributes of a state-created municipality and the exercise by that

1  briefing, Borden does acknowledge that a forum's status may change if used by private entities in

2  certain ways.  Defendants counter that "Plaintiff was not entitled to access to the Plaza during

3  private events." Doc. 23, Opposition, at 11:22.

4     The first factor is the degree to which the event is open to the general public vs. limited

5  to a set list of individuals.  Borden cites to a Ninth Circuit case in which the court upheld a

6  preliminary injunction, finding a First Amendment violation in the following circumstances:

> Plaintiff Edward Gathright is an evangelical Christian who preaches outdoors to the general public. In recent years, he has taken to doing so in various public locations in the City of Portland, including the Pioneer Courthouse Square and Waterfront Park, and often at privately sponsored, City-permitted events open to the public in those venues....
>
> On at least six occasions, Portland's police officers forced Gathright to leave the open events he attended by threatening him with arrest for trespass. They did so not because Gathright violated a public nuisance law or like ordinance, but because Portland enforces the right of permit holders sponsoring an event to evict any member of the public who espouses a message contrary to what the permit holder wants as part of its event.

13  Gathright v. City of Portland, 439 F.3d 573, 575 (9th Cir. 2006).  In that case, the status of the

14  forum was not in dispute as the City of Portland defended its policy (unsuccessfully) as a valid

15  time, place, or manner restriction.  However, the Ninth Circuit cites approvingly to a Sixth

16  Circuit case in which the status of the forum was directly addressed:

17     the City issued a permit to the Arts Council for the Arts Festival. According to the permit,

18  _____

> enterprise of semi-official municipal functions as a delegate of the State. In effect, the owner of the company town was performing the full spectrum of municipal powers and stood in the shoes of the State. In the instant case there is no comparable assumption or exercise of municipal functions or power.

22  Lloyd Corp. v. Tanner, 407 U.S. 551, 567-69 (1972).  However, the California Supreme Court

23  has examined the free speech provisions of the California Constitution and come to the opposite

24  conclusion: "A closer look at Lloyd Corp.[] has revealed that it does not prevent California's

25  providing greater protection than the First Amendment now seems to provide. We conclude that

26  sections 2 and 3 of article I of the California Constitution protect speech and petitioning,

27  reasonably exercised, in shopping centers even when the centers are privately owned." Robins v.

28  Pruneyard Shopping Ctr., 23 Cal. 3d 899, 910 (Cal. 1979).  This court would be surprised if a

29  private entity renting a public pedestrian mall would be held to a lesser California free speech

30  standard than that applied to a privately owned pedestrian mall.  However, as Plaintiff has not

31  raised any California Constitution claims in the complaint the matter need not be addressed.

the stated purpose of the Arts Festival is 'to bring visual and performing artists to the city.' The permit is non-exclusive, which, according to the testimony of a special events coordinator for the City, means that 'it is for free events open to the public.'....

Parks sought general access to public property and was not seeking to be included in any collective message of the permit holder. The Arts Festival was not a private event and, in fact, the City Code indicates that the block party permit is obtained for the purpose of 'the community at large, other than for a parade or commercial activity.' The permit itself even indicated that the Arts Council's use would be non-exclusive....The City cannot, however, claim that one's constitutionally protected rights disappear because a private party is hosting an event that remained free and open to the public. Here, Parks attempted to exercise his First Amendment free speech rights at an arts festival open to all that was held on the streets of downtown Columbus. Under these circumstances, the streets remained a traditional public forum notwithstanding the special permit that was issued to the Arts Council.

Parks v. City of Columbus, 395 F.3d 643, 645 and 652 (6th Cir. 2005).  The Third Circuit found that "like the Arts Festival in Parks, OutFest [an event free and open to the public] took place in the streets and sidewalks of Philadelphia, an undisputed quintessential public forum. The issuance of a permit to use this public forum does not transform its status as a public forum." Startzell v. City of Philadelphia, 533 F.3d 183, 196 (3rd Cir. 2008).

In contrast, some cases imply that private rental of a public space does change its status. Defendants cite to a Fourth Circuit case which suggestively stated:

If a party obtaining a permit to use public property for a specific event were constitutionally required to admit unconditionally everyone seeking admission, it would be virtually impossible to hold the event for which the permit was obtained....Were we to hold that the incidental power to exclude others from public property during the course of a limited, permitted use transformed the permit holder into a state actor, softball teams on the Mall in Washington, D.C. would be constitutionally obliged to afford due process to those not allowed to play on the particular field at the same time. Every family that barbecues at a public park would theoretically be barred from excluding uninvited guests on constitutionally suspect grounds. The local church could no longer use public facilities to hold events for fear of violating the Establishment Clause. Every picnic, wedding, company outing, meeting, rally, and fair held on public grounds would be subject to constitutional scrutiny merely because the organizer had been granted exclusive use of city facilities as well as authority to determine who may use those facilities and what they may say while on the public fora.

UAW, Local 5285 v. Gaston Festivals, 43 F.3d 902, 911 (4th Cir. 1995), citations omitted.  In Gaston, the issue was whether the action of the festival organizer constituted state action; the

1 status of the space while it was rented was not directly addressed.[3]  Similarly, one district court

2 stated in dicta that private parties renting public space for an event open to the public had

3 complete discretion to exclude people, in essence negating the space's status as a public forum

4 for that amount of time:

> turning over a city park to a private organization and letting them put on an event to
> honor and remember veterans, or to individuals for a family reunion, or even having an
> arts festival on all the city's streets. Under those circumstances, the private group merely
> has the use of public property and, therefore, could exclude whoever they wanted even
> though the event is occurring on public land and open to the public.

8 Wickersham v. City of Columbia, 371 F. Supp. 2d 1061, 1064-65 (W.D. Mo. 2005).  However,

9 the language is arguably dicta and the opinion neither elaborates nor provides citations for the

10 assertion; its precedential value is limited.

11      Defendants argue, "Plaintiff has failed to demonstrate that Brenden's events were 'open

12 to the public,' such that any person could go inside of the cordoned-off area for purposes

13 unrelated to Brenden's business enterprise. If a person could not enter Brenden's theater building

14 for a purpose unrelated to Brenden's business enterprise, then the same would apply to the

15 outdoor area that was rented from defendant CITY." Doc. 23, Opposition, at 12:21-25.  One

16 question that runs through the case law is whether the private entity was holding a private event

17 for invitees or an event open to the public.  Defendants cite no authority for the proposition that

18 "open to the general public for a business purposes" (keeping in mind that pedestrians were

19 guaranteed access to the other businesses and the right to just pass through Plaza) is different

20 from "open to the public."  Based on the facts presented, Brenden's rental of the Plaza resembles

21 the scenarios in Gathright, Parks, and Startzell, where the space retained its traditional public

22 forum status.  The obliquely contrary case law is not sufficiently persuasive on this point.

23      The second factor to be considered is the balance of first amendment free speech rights of

24 _____

25      [3]Further, the conflict in Gaston was the request by the UAW to have a booth during the
festival; the organizers denied the request while allowing other organizations to have booths.

26 The Fourth Circuit noted that "Union members may freely distribute their literature and advocate

27 political positions with the patrons of the [festival]." UAW, Local 5285 v. Gaston Festivals, 43
F.3d 902, 910 (4th Cir. 1995).  Thus, Borden's First Amendment activities would not have been

28 prevented by the rules imposed by the festival organizers.

1   competing groups.  When an individual/group rents a public space in order to express a particular

2   message, forcing that individual/group to share the stage with other speakers can result in the

3   dilution of their intended message. See Hurley v. Irish-American Gay, Lesbian & Bisexual Group

4   of Boston, 515 U.S. 557 (1995) (group holding St. Patrick's Day parade could not be forced to

5   accept float by a group celebrating lesbian, gay, and bisexual identity).  This danger is especially

6   present when the alternate message is discordant. See Sistrunk v. City of Strongsville, 99 F.3d

7   194, 196 (6th Cir. 1996) (no First Amendment violation when Bush-Quayle '92 Committee

8   rented public space to hold a campaign rally and excluded individual wearing a Bill Clinton

9   button).   The Sixth Circuit clarifies that not all private events on public lands includes a

10  message: "[the plaintiff] does not seek inclusion in the speech of another group. While it is

11  unclear that the Arts Festival was actually expressing a particular message, the City submitted

12  that the collective message of the Greater Columbus Arts Council is to bring visual and

13  performing artists to the City to be enjoyed by those who wish to go to the festival.  This is not an

14  expressive message, but merely a purpose for the event." Parks v. City of Columbus, 395 F.3d

15  643, 651 (6th Cir. 2005), citations omitted.  The same distinction between message and event

16  purpose applies in this case.  Brenden's events do not carry a message such that another speaker

17  would be considered to be participating in Brenden's speech.

18      Thus, neither factor (degree to which the event is open to the public and expressive

19  activity by Brenden) justifies a finding that the Plaza's status changed.  The entire Plaza,

20  including the barricaded areas must be considered traditional public forums on those occasions

21  when Brenden has rented it out in the pas.

22

23  **c. Time, Place, or Manner Restriction**

24      Defendants then argue that allowing Brenden to exclude Borden from the barricaded

25  areas as part of the rental agreement is a valid time, place, or manner restriction.  Critically, they

26  did not specify in their briefing exactly what that policy or restriction was. Doc. 23, Opposition,

27  at 10:22-11:21.  Time, place, or manner restrictions must be "content-neutral, [] narrowly tailored

28  to serve a significant government interest, and leave open ample alternative channels of

communication." <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 45 (1983),
citations omitted.  At oral argument on October 27, 2008, Defendants's counsel stated that
Brenden's rental of the Plaza was governed by the specific permit issued for each occasion.
Counsel admitted that the time, place, or manner restriction being defended were the specific
permits, but that she herself has not seen copies of the permits in question.

Defendants have not provided the court a concise statement of what these regulations
entail.  Plainly, the court can not find that these permits satisfy the stringent requirements of a
time, place, or manner restriction.

**2. State Action**

**a. Defendants' Actions as Opposed to Brenden's Actions**

The parties have several factual disagreements as to what actions were taken to exclude
Borden.  The court notes that Brenden is not a defendant in this case.  Thus, Borden does not
appear to be alleging that Brenden has violated his rights.  The operative legal theory is that
Modesto's actions violate Plaintiff's free speech while Brenden's actions do not.  Though Borden
has alleged a conspiracy between Modesto and Brenden, he states clearly that "Plaintiff has no
burden to demonstrate state action on Brenden's part at all.  Rather Plaintiff *has* demonstrated
state action on behalf of the Defendants in excluding him from the [P]laza in violation of his
constitutional rights." Doc. 25, Reply, at 7:14-17.  Borden has not provided enough evidence to
substantiate a conspiracy between Modesto and Brenden.  Therefore, the actions of Brenden and
its employees will not be attributed to Defendants.

At oral argument on October 27, 2008, Defendants' counsel stated that Modesto's policy
is to allow private entities to rent the Plaza for private events and to exclude individuals at will.
This confirms Borden's key assertion.  In part, Borden claims that "Defendant Rice told Mr.
Borden he needed to find another place to preach and that she intended to call Brenden Theatres
and inform them that they have the right to arrest Mr. Borden if he is found within the rented
Plaza area." Doc. 1, Complaint, at 10:10-12.  Rice states "To the best of my recollection, I told
Plaintiff that Brenden could exclude him from the cordoned-off area when they were conducting

13

1   private events....I did not tell Plaintiff that I intended to call Brenden and inform Brenden that it

2   had the right to arrest Plaintiff if he was found within the rented area of the Plaza. Furthermore, I

3   have never made such a call to anyone at Brenden." Doc. 23, Part 5, Rice Declaration, at 3:2-3

4   and 15-17.  In an e-mail, Rice told Borden that "when a usage policy has been issued for the

5   Plaza, it becomes a 'private event' and the licensee controls the area. My recommendation would

6   be as long as Brenden Theatres has rented the area, you should look for an alternative public

7   space to preach." Doc. 26, Part 4, April 14, 2008 E-mail.  Rice's own statement must be

8   understood to mean that she acknowledged to Borden that Brenden had total control of the

9   barricaded portion of the Plaza when rented, (complete with the power to have Borden arrested)

10  but that she did not specifically contact Brenden to communicate this fact.

11          Borden also claims that "Prior to the time when Brenden began renting the Plaza,

12  Lieutenant Ron Cloward of the Modesto Police Department told me that Brenden was working

13  on an agreement of some sort with the City to rent the Plaza in order to control where we could

14  engage in speech." Doc. 26, Borden Declaration, at 2:9-11.  Cloward says "I recall generally

15  having a conversation with Plaintiff during the time period he identifies in this paragraph

16  regarding the possibility of Brenden Theatres renting the Plaza area. However, I did not tell

17  Plaintiff that the reason, to my knowledge, that Brenden was contemplating renting the Plaza was

18  to control his (Plaintiff's) speech activities. To the best of my recollection, I indicated to Plaintiff

19  that there were numerous problems at the Plaza with crowd control, including problems with

20  loitering, and problems with aggressive juveniles." Doc 36, Part 4, Cloward Declaration, at 2:6-

21  12.  Borden also said "Lieutenant Ron Bloward told a couple of my companions and me that he

22  had been ordered to have his officers arrest us if we are present within the barricades." Doc. 26,

23  Borden Declaration, at 5:21-22.  Cloward responds that "I was not 'ordered' to arrest Plaintiff or

24  his associates if they were 'present within the barricades.' Furthermore, I did not instruct the

25  police officers who worked in the area of the Plaza to arrest Plaintiff or his associates if they

26  were present in this area." Doc. 36, Part 4, at 2:22-25.  What Cloward told Borden is a

27  straightforward factual dispute; the court draws no conclusion from these representation.

28          The parties talk about three categories of security in the Plaza: Brenden security

guards/employees, Plaza security guards, and Modesto police officers.  Rice states "I am informed and believe that the security guards retained by Brenden were from a private security company, and were not members of the Modesto Police Department." Doc. 23, Part 5, Rice Declaration, at 3:4-5.  Borden states, "Upon information and belief, the Plaza security officers are employed by the City." Doc. 1, Complaint, at 7:5.  Defendants did not make any representations on this matter in their filings, and when the issue was raised at oral argument on October 27, 2008, Defendants' counsel conceded that Plaza security officers are Modesto employees.

Borden claims, "On several occasions, Mr. Borden and his associates have been threatened with arrest by Brenden security officers and Plaza security for 'trespassing,' even on occasions when they have just been present in the area and not passing out literature or preaching." Doc. 1, Complaint, at 7:14-16.  Borden has presented videotape evidence that Brenden employees forced Borden's associates to stay outside the barricaded area on April 12, 2008, threatening arrest if they disobeyed. Doc. 26.  Regarding another incident that took place on March 1, 2008, Benitez states that Brenden security guards were involved but does not represent that Plaza security guards or Modesto police were involved. See Doc. 27, Benitez Declaration, at 3:9-10.  These actions are not attributed to Modesto because the guards who told Borden and his associates to leave were Brenden employees.  However, Borden does state that on Friday, May 2, 2008, Plaza security guards told him that he could not distribute literature in the Plaza. Doc. 1, Complaint, at 7:26-8:7.

In total, Borden has provided enough evidence for the court to tentatively conclude that Modesto employees did take actions to deter his First Amendment activities by having a policy of allowing Brenden unfettered discretion to exclude individuals from the barricaded portion of Plaza when rented out and making it known to Borden that police power could be used to enforce that exclusion.

**b. Acts of Modesto Employees Qualify as State Action**

Defendants assert that, "Plaintiff has failed to demonstrate state action" and discuss how "Generally, private parties are not acting under the color of state law." Doc. 23, Opposition, at

7:7-11.  First, Defendants cites to the Fourth Circuit's opinion in <u>UAW, Local 5285 v. Gaston</u> <u>Festivals</u>, 43 F.3d 902 (4th Cir. 1995).  However, the defendant in that case was the private entity renting the public space; the municipality was not sued so the holding of the case was that the private entity's acts did not constitute state action.  Defendants then argue that, "though *Gaston* involved a suit against a private entity, the same reasoning is applicable in suits against public entities and public employees," citing to <u>Reinhart v. City of Brookings</u>, 84 F.3d 1071 (8th Cir. 1996). Doc. 23, Opposition, at 8:17-20.  In <u>Reinhart</u>, the City of Brookings allowed a private committee to hold an annual arts festival in a public park and provided a police officer who patrolled the festival.  A committee member threatened the plaintiff with arrest for distributing political pamphlets in violation of a committee regulation. "Although the city commission passed a resolution in 1993 making violation of the festival committee's rules a violation of a city ordinance, that resolution expressly applied only to the 1993 festival and, as Reinhart himself admits, was never made effective by adoption of an ordinance" while the events that gave rise to the litigation happened during the 1994 festival. <u>Reinhart v. City of Brookings</u>, 84 F.3d 1071, 1073 (8th Cir. 1996).  As far as can be determined, there was no interaction between the plaintiff in the case and any city employees.  Based on those facts, the Eighth Circuit found no state action.

A recent Ninth Circuit *en banc* opinion is closer and more ambiguous.  The majority found that police enforcement of a dress code formulated by a private group holding a festival celebrating garlic did not result in municipal liability. <u>Villegas v. Gilroy Garlic Festival Ass'n</u>, 541 F.3d 950 (9th Cir. 2008).  On duty police officers (including Officer Bergman) provided security for a multi-day festival held in a public park.  The private organizers, GGFA, had an informal policy of excluding individuals who wore gang-related colors/symbols.  The plaintiffs wore clothing that identified their motorcycle club.  One of the organizers (an off duty police officer) spotted plaintiffs and asked Officer Bergman to escort them to the gate.  There, the organizer, with Officer Bergman at his side, approached the plaintiffs, explained the policy, refunded their money, and asked them to leave.  The main holding of the case is that GGFA's acts do not constitute state action.  Relevant to this case, the *en banc* majority went on to say:

The Top Hatters also contend that the City of Gilroy is liable under <u>Monell</u> for violating their First Amendment rights by enforcing the GGFA dress code. But it is generally not a constitutional violation for a police officer to enforce a private entity's rights. As the district judge noted in this case, and we agree, if the ability 'to exclude others from public property during the course of a limited, permitted use' were found to be a constitutional violation, '[e]very picnic, wedding, company outing, meeting, rally, and fair held on public grounds would be subject to constitutional scrutiny.' Because there is no constitutional violation, there can be no municipal liability.

But even if there were a constitutional violation, the Top Hatters cannot establish municipal liability under the <u>Monell</u> standard. In <u>Monell</u>, the Supreme Court held that a local government may indeed be liable for violation of constitutional rights resulting from 'a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers' or 'pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels.'

Generally, a municipality is liable under <u>Monell</u> only if a municipal policy or custom was the 'moving force' behind the constitutional violation. In other words, there must be 'a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.' Furthermore, it is not enough to 'merely [to] alleg[e] that the existing...program...represents a policy for which the city is responsible.'

Here, the Top Hatters point to the fact that the permit requires that the City's police provide a portion of the Festival's security, that the City is reimbursed for providing such security, and that Officer Bergman complied with the request of the GGFA's chair of security to remove individuals who did not comply with GGFA's dress code. None of these facts gives rise to the conclusion that the City had a policy or custom of enforcing GGFA's dress code. Furthermore, there is no evidence in the record of a custom or official policy of the City to enforce the GGFA's dress code, nor is there evidence that Gilroy officials participated in forming the dress code.

<u>Villegas v. Gilroy Garlic Festival Ass'n</u>, 541 F.3d 950, 957-58 (9th Cir. 2008), citations omitted.

Reviewing the circumstances, this court is convinced that <u>Villegas</u> must be distinguished from the case at hand for a number of reasons.

First, the *en banc* majority opinion did not deal with the actions of Officer Bergman and whether they gave rise to liability for Gilroy. The opinion dealt exclusively with the issue of whether GGFA's acts constituted state action and whether <u>Monell</u> liability flowed from that. In this case, Brenden is not being sued and the acts under consideration are those of Modesto employees acting in their official capacities. The district court in <u>Villegas</u> found that 1) Officer Bergman's actions constituted state action, 2) <u>Monell</u> liability likely applied to Gilroy, 3) GGFA was not a state actor, and 4) Plaintiffs' clothing was not expressive conduct protected by the First Amendment. See <u>Villegas v. City of Gilroy</u>, 363 F. Supp. 2d 1207 (N.D. Cal. 2005). The original district court opinion also states that "Plaintiffs' Complaint also names Officer D.

1    Bergman as a Defendant. However, 'Officer D. Bergman was ...never served with summons and

2    complaint, has never appeared, and is not a party before this Court.' Plaintiffs' counsel did not

3    dispute this at the hearing. Accordingly, pursuant to Fed. R. Civ. P. 41(b), this Court dismisses

4    all of Plaintiffs' claims against Officer D. Bergman." Villegas v. City of Gilroy, 363 F. Supp. 2d

5    1207, 1209 (N.D. Cal. 2005), citations omitted.  The district court's dismissal of claims against

6    Officer Bergman was not subsequently challenged or addressed.  With the appeal to the Ninth

7    Circuit thus framed, consideration of Officer Bergman's actions as giving an independent basis

8    for finding Monell liability separate from GGFA's actions appears to have dropped out of the *en*

9    *banc* majority's analysis.

10          On appeal, the three judge panel limited its holding by stating that, "The issues presented

11    are: 1) whether the act of wearing vests adorned with a common insignia is sufficient to establish

12    a violation of the First Amendment's right to freedom of expression; and 2) whether the plaintiffs

13    here otherwise engaged in sufficient expressive activity to establish a violation of the First

14    Amendment's right to freedom of association." Villegas v. City of Gilroy, 484 F.3d 1136, 1137

15    (9th Cir. 2007).  The *en banc* majority characterized both the district court opinion and appeal

16    narrowly:

17          The district court granted summary judgment in favor of both the City of Gilroy and the
          GGFA, ruling that wearing such vests was neither expressive conduct nor expressive
18          association within the protection of the First Amendment and that in any event the GGFA
          was not a state actor within the meaning of section 1983....
19
          The Top Hatters challenge on appeal the district court's grant of summary judgment,
20          asserting that there were genuine issues of material fact as to whether GGFA was a state
          actor and whether the Top Hatters were engaged in protected expressive conduct or
21          expressive association. The Top Hatters also assert that the City was liable for enforcing
          an unconstitutional dress code which it had impliedly adopted.
22

23    Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950, 953-54 (9th Cir. 2008).  The *en banc*

24    majority opinion itself jumps from discussing whether GGFA was a state actor to why Monell

25    does not apply in the case.  The actions of Officer Bergman were not separately analyzed.

26          The *en banc* majority does state, "it is generally not a constitutional violation for a police

27    officer to enforce a private entity's rights. As the district judge noted in this case, and we agree, if

28    the ability 'to exclude others from public property during the course of a limited, permitted use'

1   were found to be a constitutional violation, '[e]very picnic, wedding, company outing, meeting,

2   rally, and fair held on public grounds would be subject to constitutional scrutiny.' Because there

3   is no constitutional violation, there can be no municipal liability." Villegas v. Gilroy Garlic

4   Festival Ass'n, 541 F.3d 950, 957 (9th Cir. 2008).  This language could be interpreted to discuss

5   Officer Bergman in passing.  However, examination of the circumstances convinces this court

6   that no conclusion regarding Officer Bergman's part was reached.  The citation to the district

7   court's opinion clarifies the *en banc* majority's holding.  The quoted language originally comes

8   from UAW, Local 5285 v. Gaston Festivals, 43 F.3d 902, 911 (4th Cir. 1995).  Again, Gaston

9   dealt solely with whether the acts of the festival organizers constituted state action; no

10  municipality or governmental employee was sued.  Similarly, the Villegas district court used the

11  language to show why GGFA is not a state actor. See Villegas v. City of Gilroy, 363 F. Supp. 2d

12  1207, 1216 (N.D. Cal. 2005).  In discussing  district court discussing the potential liability arising

13  from Officer Bergman's actions, the district court never referenced Gaston or the line of

14  reasoning contained in the quote.  The *en banc* majority neither cited to nor discussed the district

15  court's separate discussion of Officer Bergman.  Thus, this court concludes that the *en banc*

16  majority used the quoted language solely to explain why GGFA was not a state actor and not as a

17  discussion of potential liability for Officer Bergman's actions.

18          A second factor distinguishing the case is that the Gilroy Garlic Festival's use of public

19  space is significantly different from Brenden's.  Borden points out that, "one must purchase a

20  ticket in order to gain admission to the festival." Doc. 25, Reply, at 11:7-8.  The Gilroy Garlic

21  Festival had exclusive use of the park grounds and did not have to allow pedestrians to pass

22  through.  It appears likely that the status of the park changed when taken over by the GGFA.

23  Thus, individuals did not enjoy the same First Amendment protections as in a traditional public

24  forum.  Though the various opinions in Villegas did not discuss this aspect of the case, this court

25  is convinced that Villegas is distinguishable from both the case at hand and Gathright on this

26  ground.

27          Third, Villegas is the result of one incident.  The *en banc* majority found that, "there is no

28  evidence in the record of a custom or official policy of the City to enforce the GGFA's dress

code." Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950, 958 (9th Cir. 2008).  "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved." Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985).  In Villegas, there may not have been the evidentiary basis for finding a custom or policy based on one incident.  In this case, Borden has sufficiently shown for purposes of preliminary injunction that there likely were several incidents involving Modesto employees.  In Gathright, the Ninth Circuit found that "On at least six occasions, Portland's police officers forced Gathright to leave the open events he attended by threatening him with arrest for trespass." Gathright v. City of Portland, 439 F.3d 573, 575 (9th Cir. 2006).

In Parks, the Sixth Circuit found state action where a police officer performing security for an arts festival threatened to arrest someone and the city affirmed that the festival organizers had the right to exclude whoever they wished:

> First, regardless of whether Officer Farr was on or off duty, he presented himself as a police officer. We have held that a police officer acts under color of state law when he purports to exercise official authority. Such manifestations of official authority include flashing a badge, identifying oneself as a police officer, or placing an individual under arrest. In this case, Officer Farr was dressed in his official police uniform and his badge was displayed. He identified himself as 'Officer Farr' and, while he did not actually arrest Parks (because Parks complied with his order), he nevertheless threatened arrest. We believe that all of these factors combined create the presumption of state action. Thus, Officer Farr was acting as a state actor when he commanded Parks to leave Center Civic Drive.
>
> Second, and equally significant to the specific actions of Officer Farr, the City and its agents supported the permitting scheme that ostensibly provided a permit-holder with unfettered discretion to exclude someone exercising his constitutionally protected rights from a public street. The City issued a permit to the Arts Council that was non-exclusive and open to the public. The streets remained a traditional public forum. After complaining to the City that his First Amendment rights had been violated, Parks received a letter from the City Attorney defending the actions of the permit holder. The letter emphasized that the streets at issue were no longer a public area where Parks's First Amendment rights would apply because a private sponsor was using the area pursuant to City ordinance. The letter argued that the permit allows the permittee to use the street for its purpose, and therefore the '[Arts] Council had every legal right to request Mr. Parks to move on or be arrested.' The City's policy went as far as to endorse the unfettered discretion of the sponsor; a City representative testified that it is 'the practice of the City in carrying out these ordinances to permit the event organizers to determine what activities will be permitted at the event.' We find that all of these factors amounted to state action.

20

1  Parks v. City of Columbus, 395 F.3d 643, 652-53 (6th Cir. 2005), citations omitted.  As in

2  Gathright, a policy that allows a private entity who rents public space unfettered discretion to

3  exclude is unconstitutional.  Modesto has such a policy and has taken steps to enforce it by

4  deterring Borden from exercising his First Amendment rights.  This satisfies the state action

5  requirement.

6

7  **C. Injunction Standards**

8          Though much of the evidence presented by both sides is tentative and based on hearsay,

9  enough has been provided to demonstrate that Borden will likely prevail on the merits.  "The loss

10  of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes

11  irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976), citing New York Times Co. v.

12  United States, 403 U.S. 713 (1971).  Defendants argue that Brenden has not rented the Plaza for a

13  number of months and so there is no danger to Borden's rights.  Yet, Modesto does not state that

14  it will stop renting the Plaza to Brenden pending the resolution of this case or that it will stop

15  trying to enforce Brenden's alleged attempts at ousting Borden from the barricaded portion of the

16  Plaza.  The threat is sufficient to warrant an injunction.

17          The parties have been unable to agree upon language for a proposed injunction.  Borden's

18  proposal binds Brendan and other potential renters of the Plaza in addition to Modesto.  Again,

19  this court interprets Borden's motion for preliminary injunction narrowly.  The injunction does

20  not bind Brenden as it is not a party to this case.  Very simply, the alleged attempts by Brenden to

21  stifle Borden's speech would not be considered First Amendment violations (based on the

22  evidence presented thus far) as they are not state action.  Thus, while Brenden might try to

23  wrongfully exclude Plaintiff from the barricaded portion of the Plaza, Modesto may not use its

24  police power to enforce that exclusion.  There is no need for a bond in this case as the injunction

25  does not appear to monetarily burden Defendants in any way.

26

27                                    **IV. Order**

28          Plaintiff's motion for preliminary injunction is GRANTED.

**21**

1    It is ORDERED that the City of Modesto, its employees, and officials are preliminarily

2 enjoined immediately, and through the pendency of this action, from excluding Kevin Borden

3 from the Tenth Street Plaza when it is not being rented for a private event closed to the public

4 unless there is probable cause to believe Plaintiff has violated a valid federal law, state law, or

5 local ordinance.  An event "closed to the public" for purposes of this injunction is one that either

6 (a) is held in a defined area to which only those individuals attending that particular event are

7 permitted to enter or (b) involves the expression of a particular message such that allowing other

8 expression within the permitted area would compromise the First Amendment rights of the

9 permittee, as discussed in Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,

10 515 U.S. 557 (1995).  This injunctive order shall not be construed to mean that Kevin Borden is

11 entitled to anything more than equal access to the Tenth Street Plaza (or any particular spot

12 within the Tenth Street Plaza) as a traditional public forum, or that he is entitled to attend any

13 event within the Tenth Street Plaza that is closed to the public.

14

15 IT IS SO ORDERED.

16 **Dated:     November 19, 2008          /s/ Anthony W. Ishii**
                                          CHIEF UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28